

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-24-00713-CR

Jacob Daniel **PULLEN**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 25th Judicial District Court, Guadalupe County, Texas
Trial Court No. 20-0296-CR-B
Honorable William D. Old III, Judge Presiding

Opinion by:    Velia J. Meza, Justice
Dissenting Opinion by: Adrian A. Spears II, Justice

Sitting:    Lori Massey Brissette, Justice
Adrian A. Spears II, Justice
Velia J. Meza, Justice

Delivered and Filed: July 1, 2026

VACATED IN PART; AFFIRMED IN PART AS MODIFIED

Jacob Pullen visited a webpage containing seven thumbnail images depicting children being sexually abused. The State charged and convicted Pullen on seven counts of accessing with intent to view visual material depicting a child who is engaging in sexual conduct—one count for each thumbnail. *See* TEX. PENAL CODE ANN. § 43.26 (West 2019). This appeal presents a question of first impression: what is the allowable unit of prosecution under section 43.26 for "accesses

with intent to view"? Pullen also challenges the sufficiency of the evidence regarding the remaining conviction and his bona fide educational purpose defense, the denial of his speedy-trial motion, the admission of a federal agent's remote testimony, the admission of magnified thumbnail images, the propriety of the State's closing argument, and certain recitations in the judgment.

Although we find the evidence legally sufficient to support Pullen's conviction on one count, we hold that the statute is genuinely ambiguous as to whether seven images on a single webpage constitute one offense or seven. Thus, we apply the rule of lenity, vacate the convictions on counts two through seven, modify the remaining judgment to reflect that the jury assessed punishment, and otherwise affirm.

## BACKGROUND

Jacob Pullen was an internal affairs lieutenant with the New Braunfels Police Department. On the evening of July 2, 2019, Pullen used his personal iPad and a special internet browser (the "Tor" browser) to access the dark web from the comfort of his living room. According to Pullen, in an attempt to learn how the dark web worked, he clicked through a series of links on the "Hidden Wiki."[1]

In any event, he navigated to a site entitled "DeepThroat," which purported to sell compilations of "teen porn." The page advertised two memberships—a "Basic" tier for 0.005 BTC and a "Premium" tier for 0.008 BTC[2]—for "the largest collection of teen porn user-submitted videos and photos." Below the membership information, the site displayed a collage of child sexual

---

[1] According to a defense expert, the Hidden Wiki "is a collection of information, sites, and links to different areas on the dark web."

[2] "BTC" is an abbreviation for bitcoin, a decentralized digital currency that is commonly used on dark-web marketplaces because its peer-to-peer transfer mechanism allows payments to be made without traditional banking intermediaries.

abuse material (CSAM)[3] in the form of seven thumbnail images. Pullen ultimately sent 0.008 BTC to the bitcoin address displayed on the site.

Six days later, a federal task force dedicated to dark-web and cryptocurrency crimes accessed the DeepThroat page. Using blockchain analysis on the bitcoin wallet address displayed on the page, Special Agent Krista Garcia with Homeland Security Investigations (HSI) traced the 0.008 BTC transaction back to the Coinbase wallet associated with Pullen's IP and email address. Subpoenas to various companies, BitPay, AT&T, Valve, Newegg, IPVanish, and ExpressVPN, confirmed that the IP address, the Coinbase account, and the underlying ProtonMail account belonged to Pullen.

Upon confirming that a Texas police officer was involved, the federal investigation was transferred to the Texas Rangers. On December 9, 2019, Ranger Joseph Evans interviewed Pullen and executed search warrants on Pullen's home, devices, and cloud accounts. No saved CSAM files were recovered from any of Pullen's devices, and only his iPhone and iPad contained the Tor browser. Forensic analyses of these devices showed that, on the night of July 2, 2019, Pullen opened the Tor browser and sent the bitcoin payment. Ranger Evans arrested Pullen the same day as the interview.

A Guadalupe County grand jury returned a seven-count indictment. Each count alleged that Pullen intentionally and knowingly accessed with intent to view one of the seven thumbnail

---

[3] Where possible we use the phrase "child sexual abuse material" rather than "child pornography." The term "pornography" describes material in which individuals consensually engage in recorded sex acts which are distributed to the public for their sexual pleasure; using this term to describe recorded sex acts involving children risks implying consent of the child and trivializing the harmful nature of the material. *See* Susanna Greijer & Jaap Doek, *Interagency Working Group on Sexual Exploitation of Children*, *Terminology Guidelines for the Protection of Children from Sexual Exploitation and Sexual Abuse* 39 (2016), https://www.ohchr.org/sites/default/files/TerminologyGuidelines_en.pdf [https://perma.cc/H7B8-R3D7] (last visited June 3, 2026). "Child sexual abuse material" more accurately describes the recorded sexual abuse of a child and reflects the harm that the very existence of the images inflicts on the depicted child. *Id.* at 38–40. This terminology has been increasingly adopted by courts and legislatures across the country. *E.g., In re Elhindi*, 704 S.W.3d 425, 426 (Tex. 2024) (orig. proceeding); 34 U.S.C. § 20942(a)(1).

images depicted on the DeepThroat site. At trial, the State called federal investigators, Ranger Evans, an HSI forensic examiner, and a crime-scene supervisor as witnesses. Special Agent Garcia testified by videoconference pursuant to a *Touhy* letter.[4]

Pullen testified in his own defense. He admitted to accessing the site and sending the payment. However, he insisted he had not sought out CSAM and did not recall viewing the thumbnail collage. He claimed he sent the bitcoin to see whether the "awaiting payment" status on the page would update, explaining that his conduct was part of self-directed education and that he was investigating illegal activity that he could refer to the San Antonio cybercrimes task force.

The jury was instructed on all seven counts of the indictment and two affirmative defenses requested by Pullen: that his conduct was for a bona fide educational purpose, and that it was for a bona fide law-enforcement purpose. *See* TEX. PENAL CODE ANN. §§ 43.26(c), 43.25(f)(3) (West 2019). The jury returned guilty verdicts on all seven counts. Pullen elected for punishment to be assessed by the jury. The jury assessed Pullen's punishment for each count at six years' confinement, no fine, and recommended community supervision. The trial court ordered Pullen's punishment to run concurrently and placed Pullen on eight years' community supervision. This appeal followed.

## DISCUSSION

Pullen raises seven issues: (1) the legal sufficiency of the evidence supporting each conviction under section 43.26; (2) the legal and factual sufficiency supporting his bona fide educational purpose defense; (3) the denial of his speedy trial motion; (4) the admission of Special Agent Garcia's videoconference testimony in light of his Confrontation Clause objection; (5) the

---

[4] *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951) is a United States Supreme Court case that "is part of an unbroken line of authority which [holds] that a federal employee may not be compelled to obey a subpoena contrary to his federal employer's instructions under valid agency regulations." *Boron Oil Co. v. Downie*, 873 F.2d 67, 69–70 (4th Cir. 1989).

admission of a magnified version of the seven charged images; (6) his overruled objection to a portion of the State's closing argument; and (7) the judgment's recitation that the trial court assessed punishment, rather than the jury.

## 1 Legal sufficiency of convictions

Pullen's initial issue consists of two distinct questions. The first is whether the evidence supports any conviction at all. If so, then the second is whether Pullen's conduct supports seven convictions or only one.

We review sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, asking whether, viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found all essential elements of the offense beyond a reasonable doubt. 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895, 912 (Tex. Crim. App. 2010). Statutory construction—including determining the "allowable unit of prosecution"—is a question of law we review de novo. *Harris v. State*, 359 S.W.3d 625, 629 (Tex. Crim. App. 2011).

### 1.1 Possession of, and access to, CSAM

Section 43.26, as in effect in 2019, provides that a person commits an offense if the person "knowingly or intentionally accesses with intent to view" visual material that visually depicts a child engaging in sexual conduct, knowing the material depicts a child. TEX. PENAL CODE ANN. § 43.26(a) (West 2019). The Legislature added the "accesses with intent to view" alternative in 2013, creating a new mode of commission distinct from the existing "possession" offense. *See* Act of May 23, 2013, 83rd Leg., R.S., ch. 1252, § 20, 2013 Tex. Gen. Law 3167, 3171 (amending section 43.26 of the Texas Penal Code). No Texas appellate court has yet construed the access language.

When interpreting statutes, we focus on the literal text to effectuate the collective intent of the Legislature. *State v. Robinson*, 498 S.W.3d 914, 920 (Tex. Crim. App. 2016). Statutes must be read as a whole and, where possible, each provision construed to give effect to all others. *See* TEX. GOV'T CODE § 311.021(2); *Bays v. State*, 396 S.W.3d 580, 584–85 (Tex. Crim. App. 2013). We begin by contrasting the two distinct *actus rei* the Legislature proscribed under section 43.26(a): "possession" and "access."

"Possession" is expressly defined and requires proof of "actual care, custody, control, or management." TEX. PENAL CODE § 1.07(a)(39). In the context of our digital age, images stored on a computer rarely lie within a defendant's exclusive control. Thus, possession is established by the "cumulative force of all the evidence"—direct and circumstantial—linking the defendant to the images and showing both knowledge of their nature and the ability to exercise control over them. *See Wise v. State*, 364 S.W.3d 900, 903–05 (Tex. Crim. App. 2012) (describing approaches to proving possession of digital CSAM). Typical linking evidence includes showing the defendant saved copies in intentionally named folders, showing the defendant transferred files to an external drive, presenting file viewing or modification history, and establishing the defendant's technical sophistication. *See Krause v. State*, 243 S.W.3d 95, 110–12 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *Ballard v. State*, 537 S.W.3d 517, 523–24 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd)

"Access," however, is not about the defendant's custody or control. The term is undefined as it relates to this statute; we therefore construe it "as ordinary usage allows." *Dunham v. State*, 666 S.W.3d 477, 484 (Tex. Crim. App. 2023) (citation modified). Chapter 33 of the Penal Code, which concerns computer crimes, defines the term as meaning "to approach, instruct, communicate with, store data in, retrieve or intercept data from, alter data or computer software in, or otherwise

make use of any resource of a computer." TEX. PENAL CODE § 33.01(1). Merriam-Webster defines the verb form of "access" as "to be able to use, enter, or get near (something)" and "to open or load (a computer file, an Internet site, etc.)." Access, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/access [https://perma.cc/S8KQ-LERJ] (last visited May 27, 2026). These definitions suggest that the Legislature chose a term describing the initial, preliminary act of retrieval, loading, or approach.

Federal courts have construed nearly identical language in the same way.[5] The federal statute punishes access with intent to view "any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography." 18 U.S.C. § 2252A(a)(5).[6] Federal courts of appeals considering this language have uniformly held that it criminalizes access to "a website that contains child pornography" when the person "intends to view that illegal content, even if he never actually does so." *United States v. Tagg*, 886 F.3d 579, 587–90 (6th Cir. 2018); *accord United States v. Croghan*, 973 F.3d 809, 828 (8th Cir. 2020); *United States v. Mercer*, 772 F. App'x 631, 636 (10th Cir. 2019) (following *Tagg*); *United States v. Rivenbark*, 748 F. App'x 948, 956–57 (11th Cir. 2018) (contrasting "possession" with "access with intent to view" and holding the latter does not require viewing the CSAM itself).

Under the federal framework, the act of "access" is treated as attempted possession. Liability is triggered "when a person intentionally searches for images of child pornography, finds them, but then stops short of viewing the images themselves." *Tagg*, 886 F.3d at 588 (quoting

---

[5] Although federal decisions do not bind us, they are persuasive where, as here, they have repeatedly addressed the precise question we now face and have reached a uniform answer.

[6] This federal statute was amended in 2008 to add the phrase "accesses with intent to view." Enhancing the Effective Prosecution of Child Pornography Act of 2007, Pub. L. No. 110–358, § 203(b), 122 Stat. 4001, 4003–04 (2008). A Senate report explained that the amendment "fills a gap in existing law that has led some courts to overturn convictions of possessors of child pornography." S. REP. No. 110–332, at 5 (2008). The amendment was intended to "fix[] another loophole that allowed Internet users to get around the laws against possessing child pornography simply by not downloading or saving the images." 154 CONG. REC. H9888 (daily ed. Sept. 25, 2008) (statement of Rep. Lofgren).

*United States v. Ramos*, 685 F.3d 120, 132 (2d Cir. 2012)) (citation modified). The crime is complete "the moment the elements of access and intent coincide." *Tagg*, 886 F.3d at 587. "The person who completes the circle and views the image has, instead, committed the *actus reus* of possession." *Id*. (citing *Ramos*, 685 F.3d at 130–32). The text of section 43.26(a), the contrast with the "possession" alternative, and the converging federal authority, all point to the same understanding of "access."

Applying this construction to the evidence before us, we conclude the evidence is legally sufficient to support at least one conviction. Pullen admitted that he navigated to the DeepThroat page; that he read the splash page advertising "teen porn"; and that he understood the page to be "hinting" at illegal material. He then sent 0.008 BTC—worth approximately $90 at the time—to the bitcoin address displayed on the page, paying for a "Premium" subscription. Six days later, two federal investigators independently accessed the same page, observed the same advertisement, and observed a collage of seven thumbnails depicting children engaged in sexual conduct beneath that advertisement. Ranger Evans testified that the website was a known destination for CSAM and that the site contained the same material both before and after Pullen's visit.

"For computer-pornography cases, like all criminal cases, a court must assess whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence considered in the light most favorable to the verdict." *Wise*, 364 S.W.3d at 905. Pullen argues that he did not see the thumbnails on the webpage and that the State could not prove the thumbnails were on the page at the moment he accessed it, suggesting that the page might have changed after he visited the site. We "presume that the factfinder resolved any conflicts in favor of the prosecution" and defer to that determination. *Jackson*, 443 U.S. at 326 (citation modified). The jury was entitled to credit Ranger Evans's testimony, together with Pullen's admissions about

what he read and what he paid for, in concluding that he accessed visual material depicting children engaging in sexual conduct, with the intent to view that material, and with knowledge of its character. The jury was free to disbelieve Pullen's testimony that he did not see CSAM on the webpage and, instead, draw the rational inference that Pullen, reading the page's advertising and paying for a "Premium" subscription, accessed the page with the intent to view CSAM.

Pullen also argues the evidence was legally insufficient to establish that the thumbnail images depicted children. The Penal Code does not define what makes a depiction "lewd" or fix a single method for determining the age of a person shown in an image. Texas courts have looked, instead, to the six nonexclusive factors articulated in *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986): (1) whether the focal point of the depiction is on the child's genitalia or pubic area; (2) whether the setting is sexually suggestive; (3) whether the child is shown in an unnatural pose or in inappropriate attire for the child's age; (4) whether the child is fully or partially clothed, or nude; (5) whether the depiction suggests sexual coyness or a willingness to engage in sexual activity; and (6) whether the depiction is designed to elicit a sexual response in the viewer. *See State v. Bolles*, 541 S.W.3d 128, 140–42 (Tex. Crim. App. 2017) (applying the *Dost* factors and noting their usefulness in assessing the sufficiency of evidence of a lewd exhibition). The factors are "simply guideposts or a starting point," and a depiction need not satisfy all six to qualify as lewd. *Bolles*, 541 S.W.3d at 141.

We have reviewed the seven thumbnail images contained in the sealed exhibits offered by the State. Each image contains children who are visibly prepubescent or pubescent, the focal points are on their nude bodies, and the acts depicted are clearly sexual. Each shows a child engaged in sexual conduct or in a lewd exhibition of the genitals or pubic area within the meaning of section

43.26. The jury could have rationally concluded, on the face of the images, that each depicted a child under eighteen engaged in sexual conduct and that Pullen knew the images depicted children.

The evidence is therefore legally sufficient to support a conviction under section 43.26. We next consider how many convictions the evidence supports.

### 1.2 What is the allowable unit of prosecution?

Pullen contends his act of accessing the DeepThroat website cannot support seven separate convictions and that, properly construed, section 43.26 authorizes only one conviction here. The State insists that each individual thumbnail image should allow an independent conviction.

Here, because Pullen was charged with multiple offenses under a single statutory provision, the dispositive question is: what unit of prosecution did the Legislature authorize under section 43.26? *See Sanabria v. United States*, 437 U.S. 54, 69–70 (1978) ("Whether a particular course of conduct involves one or more distinct 'offenses' under the statute depends on . . . congressional choice."); *Ex parte Hawkins*, 6 S.W.3d 554, 556 (Tex. Crim. App. 1999) (adopting *Sanabria* and holding that the legislature defines the "allowable unit of prosecution").

The State relies on a holding announced in *Vineyard v. State*, where the Court of Criminal Appeals held that, under the then-existing version of section 43.26, "possession of each item of child pornography" is an "allowable unit of prosecution." *Vineyard v. State*, 958 S.W.2d 834, 840 (Tex. Crim. App. 1998). That holding, however, was grounded in statutory text materially different from the text at issue here. The version of section 43.26 before the *Vineyard* court provided that a person committed an offense if the person "knowingly or intentionally possesses *material containing a film image* that visually depicts a child" engaging in sexual conduct, where "film image" was defined to "include[] a photograph, slide, negative, film, or videotape, or a reproduction of any of these." *Id.* at 841 (Meyers, J., concurring) (emphasis added) (quoting the

1985 enactment). The defendant in *Vineyard* simultaneously possessed two discrete items—a videotape and a photograph—and was separately prosecuted for each. *Id.* at 835. The court held that, given the singular phrasing of "material containing a film image" and consistent with its earlier decisions in *Ex parte Rathmell*, 717 S.W.2d 33 (Tex. Crim. App. 1986), and *Iglehart v. State*, 837 S.W.2d 122 (Tex. Crim. App. 1992), the Legislature intended each "item" of CSAM to be a separately punishable unit. *Vineyard*, 958 S.W.2d at 838–40.

The *Vineyard* majority acknowledged a dissent in *Iglehart*, where Judge Clinton argued that a theft statute was ambiguous "at best" regarding the unit of prosecution and that the rule of lenity should be applied. *Vineyard*, 958 S.W.2d at 837–38 (discussing *Iglehart*, 837 S.W.2d at 133–34 (Clinton, J., dissenting)). The majority rejected Judge Clinton's analysis because it determined the statute was not ambiguous. *See Vineyard*, 958 S.W.2d at 838 & n.7.

Section 43.26 has changed substantially since *Vineyard*. First, the Legislature replaced the object of the offense, "material containing a film image," with the defined term "visual material." *See* Act of May 23, 1997, 75th Leg., R.S., ch. 933, § 1, 1997 Tex. Gen. Laws 2931, 2932 (amending TEX. PENAL CODE § 43.26). This new term incorporates some of the old language but, critical here, expressly brings digital storage and transmission within the ambit of the statute. Second, as discussed above, the Legislature added the access-with-intent-to-view alternative. *See* Act of May 23, 2013, 83rd Leg., R.S., ch. 1252, § 20, 2013 Tex. Gen. Law 3167, 3171 (amending TEX. PENAL CODE § 43.26).

*Vineyard*'s framework—that the unit-of-prosecution inquiry begins with the statute's text and focus—still guides our analysis. But its holding that "each item of child pornography" is the unit of prosecution for possession of "material containing a film image" does not answer what the

unit of prosecution is for access with intent to view "visual material." That question is one of first impression, and we approach it using the ordinary tools of statutory construction.

Applied to this case, the question becomes whether the act of accessing a webpage that displays a thumbnail collage of seven depictions is one act of access or seven. The evidence shows that Pullen accessed the DeepThroat website a single time. As to the images, the evidence showed the seven charged depictions were components of a single graphic element on a single page of that website—what was repeatedly described as a "collage." And there is no evidence that Pullen clicked on the images or interacted with them in any way.

Applying the statute to this set of facts is not simple. The digital-media prong of the "visual material" definition joins two clauses with the conjunction "and": a "disk, diskette, or other physical medium that allows an image to be displayed on a computer or other video screen" *and* "any image transmitted to a computer or other video screen by telephone line, cable, satellite transmission, or other method." TEX. PENAL CODE ANN. § 43.26(b)(3)(B) (West 2019). Thus, "visual material" as defined by the statute can plausibly be read at least two ways, depending on how "and" is interpreted. If read disjunctively, "visual material" would include each physical medium *or* each transmitted image. If read conjunctively, "visual material" would be a single integrated category—a physical medium containing any image transmitted over the internet.

The disjunctive reading was adopted by the Montana Supreme Court, interpreting a Montana statute on which the Texas "visual material" definition was patterned.[7] In *State v. Felde*, the Montana Supreme Court held that the definition was unambiguous and that the unit of prosecution was "each image of child pornography that [the defendant] possessed." 478 P.3d 825,

---

[7] The Texas provision was modeled on the 1995 version of the Montana statute. *See Hearing on Tex. S.B. 674 Before the S. Comm. on Crim. Juris.*, 75th Leg., R.S. (March 4, 1997) (statement of Sen. Brown, bill author) (available at https://tsl.access.preservica.com/uncategorized/IO_af6059f4-4cf6-4584-9a00-98b3055645a2) (statement begins at approx. 28 minutes, tape 0385, side 1).

828–29 (Mont. 2021) (interpreting MONT. CODE ANN. § 45-5-625(5)(d)(ii) (West 2021) which defined "visual medium" as "any disk, diskette, or other physical media that allows an image to be displayed on a computer or other video screen and any image transmitted to a computer or other video screen by telephone line, cable, satellite transmission, or other method"). While this disjunctive reading adopted by Montana is plausible, given the State's interest in deterring the proliferation of child pornography, as we explain below: so is the conjunctive reading.

The Texas Supreme Court recently confronted a closely analogous problem—how to read a punitive statute that joined two requirements with "and." In *Malouf v. State ex rel. Ellis*, the court considered a civil-penalty provision that imposed liability on a Medicaid provider who submits a claim and "knowingly fails to indicate the type of license . . . and the identification number of the licensed health care provider who actually provided the service." 694 S.W.3d 712, 716–17 (Tex. 2024). The State argued that "and" should be read disjunctively: a provider violated the statute by failing *either* to indicate the license type *or* to indicate the identification number. *Id*. The defendant argued "and" should instead be read conjunctively: *both* failures must occur to trigger liability. *Id*. The *Malouf* court rejected the State's reading. It held that "and" "ordinarily connotes the conjunctive," and that the conjunctive reading best fit the statute's text, context, and purpose. *Id*. at 718, 723. The court added, in the alternative, that "even if the State's construction was reasonable, the rule of lenity would require [it] to construe the statute in [the defendant]'s favor." *Id*. at 731.

Here, the State's preferred reading of "visual material"—essentially that "and" means "or," so that each transmitted image stands alone as a separate unit of prosecution—is a disjunctive reading the *Malouf* court rejected on grounds similar to the text at issue. While *Malouf* arose in the

civil-penalty context, its reasoning carries even greater weight here, where a defendant's liberty—not merely his civil liability—turns on the meaning of "and."

Syntax is not the only obstacle to the State's position. Setting "and" aside, the statute supplies no rule for counting images on a webpage. Must the State prove that each image rendered before the page was closed? What if an image completely fails to load? Must the State prove that the defendant's browser window was large enough to show all images, or that the defendant scrolled through them? Whether the relevant unit is "each item" or "each image," the State's reading does not supply answers. And we hesitate to invent answers that would multiply a single act of access into an indeterminate number of offenses based on the happenstance of how a webpage is laid out. *Cf. Yates v. United States*, 574 U.S. 528, 547–48 (2015) (rejecting interpretation that would yield harsh and incongruous results). The film-and-videotape analog confirms this point: a film or videotape may contain many individual images of sexual abuse, but the offense is counted per film or videotape, not per image within them. *See Vineyard*, 958 S.W.2d at 836 (allowing successive prosecutions based on possession of a photograph and videotape, even though both prosecutions "arose out of the same transaction").

Regardless, the rule of lenity supplies the tiebreaker. It is a common law rule that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Liparota v. United States*, 471 U.S. 419, 427 (1985); *accord Diruzzo v. State*, 581 S.W.3d 788, 802 n.22 (Tex. Crim. App. 2019); *Bell v. United States*, 349 U.S. 81, 83 (1955) ("[W]hen Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity.").

Where, as here, a statute is genuinely ambiguous on the question of how many offenses the conduct at issue supports, the rule of lenity tips the balance against multiplying punishments.

*Diruzzo*, 581 S.W.3d at 802 n.22; *Bell*, 349 U.S. at 83; *see also Malouf*, 694 S.W.3d at 720. While the jury reasonably concluded that Pullen accessed a site containing seven images, the appropriate unit of prosecution for "access" is each act of accessing the medium in which those depictions reside—here, the webpage.[8] *See Tagg*, 886 F.3d at 588 ("Grammatically, the word 'accesses' (the actus reus of the crime) is directed towards the repository containing child pornography, not the child pornography itself."); *accord Vineyard*, 958 S.W.2d at 838 (holding "each item of child pornography" is the "allowable unit of prosecution"). The evidence therefore supports only one conviction.

We acknowledge the grave interests that CSAM statutes exist to protect. They are not merely directed at obscenity, they exist to deter the proliferation of material that normalizes the sexual exploitation of children, supplies leverage for the extortion of child victims by means of images of their abuse, and creates a permanent, recurrent record of that abuse. *See Paroline v. United States*, 572 U.S. 434, 457 (2014) (recognizing that "[e]very viewing of child pornography is a repetition of the victim's abuse" and reinforces ongoing harm); *Osborne v. Ohio*, 495 U.S. 103, 109–11 (1990) (recognizing the State's interest in "stamp[ing] out this vice at all levels in the distribution chain"); *New York v. Ferber*, 458 U.S. 747, 758–60 & n.10 (1982) (categorically excluding CSAM from First Amendment protection because production and distribution are "intrinsically related" to the sexual abuse of children); *see also* Audrey Rogers, *Child Pornography's Forgotten Victims*, 28 Pace L. Rev. 847, 852–54 (2008) (discussing the continuing harm to victims from circulation of images). The question we resolve is simply how many such offenses one act of access supports, not whether the conduct may be punished at all. Pullen's

---

[8] Or, more accurately, the physical server on which that webpage is hosted.

conduct remains a felony, and a single conviction under section 43.26(a) carries substantial punishment. *See* TEX. PENAL CODE ANN. § 43.26(d) (West 2019).

The power to affix the allowable units of prosecution rests solely with the Legislature. *Cf. Aekins v. State*, 447 S.W.3d 270, 286 (Tex. Crim. App. 2014) (Keller, J., concurring). When a defendant is convicted of more offenses than permitted and the sentences are identical, the appropriate remedy is to affirm the conviction for each allowable count and vacate the remainder. *See generally Ex parte Cavazos*, 203 S.W.3d 333, 337–39 (Tex. Crim. App. 2006) (discussing how after a finding of double jeopardy, the "most serious" offense is retained while the other convictions are set aside). We therefore vacate counts two through seven.

## 2    Bona fide educational purpose defense

Pullen next raises a legal and factual sufficiency challenge to the jury's rejection of his bona fide educational purpose defense.

A defendant bears the burden of proving an affirmative defense by a preponderance of the evidence. TEX. PENAL CODE § 2.04(d); *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). When a jury rejects an affirmative defense and a defendant assigns error to that finding on appeal, we ask whether the evidence "conclusively proves [the] affirmative defense and 'that no reasonable jury was free to think otherwise.'" *Id.* at 670. For factual sufficiency, we may reverse only if the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Id.* at 671.

Section 43.26(c), as in effect at time of the charged offenses, made the affirmative defenses in § 43.25(f) applicable to a prosecution under § 43.26. Section 43.25(f), in turn, established a defense to prosecution where "conduct was for a bona fide educational . . . purpose." TEX. PENAL CODE ANN. § 43.25(f)(3) (West 2019).

Under the legal-sufficiency standard, the jury was entitled to conclude that Pullen's conduct was not for a bona fide educational purpose. *See Matlock*, 392 S.W.3d at 670. While some evidence supports the defense—Pullen's enrollment in a cybersecurity program and his attendance at the FBI National Academy the prior year—it is far from conclusive. Nor, under the factual-sufficiency standard, is the jury's rejection of this defense so against the great weight and preponderance of the evidence as to be manifestly unjust. *Id*. at 671. We overrule Pullen's second issue.

## 3    Speedy trial

Pullen contends the trial court erred in denying his speedy trial motion. We review a trial court's ruling on a motion for speedy trial for abuse of discretion. *State v. Gabaldon*, 727 S.W.3d 1, 14 (Tex. Crim. App. 2025); *Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002). "Dismissal of the charging instrument with prejudice is mandated only upon a finding that an accused's Sixth Amendment speedy-trial right was actually violated." *Cantu v. State*, 253 S.W.3d 273, 281 (Tex. Crim. App. 2008). The trial court "must use a balancing test in which the conduct of both the State and the defendant are weighed" in order to analyze such claims. *Shaw v. State*, 117 S.W.3d 883, 888 (Tex. Crim. App. 2003) (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). The State must justify the length of delay while the defendant has the burden of showing assertion of the right and demonstrating how the delay caused prejudice. *Cantu*, 253 S.W.3d at 280–81. Each case must be analyzed "with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed." *Id*. at 281.

The *Barker* factors are (1) the length of delay; (2) the reason for delay; (3) the defendant's timely assertion of his speedy trial right; and (4) the prejudice to the defendant resulting from

delay. *Barker*, 407 U.S. at 530. "No single factor is necessary or sufficient to establish a violation of the defendant's right to a speedy trial." *Shaw*, 117 S.W.3d at 889. "Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533. This is because a dismissal resulting from "a wooden application of the *Barker* factors would infringe upon 'the societal interest in trying people accused of crime.'" *Cantu*, 253 S.W.3d at 281.

**Length of delay**. Pullen was arrested on December 9, 2019, and trial began August 26, 2024—a delay of approximately four years and eight months. That delay is well past the one-year threshold generally considered presumptively prejudicial.[9] *Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003); *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992). This factor weighs against the State.

**Reason for delay**. The record reflects a mix of causes for the nearly five-year delay. A substantial portion of the early delay is attributable to the COVID-19 pandemic and the corresponding suspension of jury trials under emergency orders of the Supreme Court of Texas. Pandemic-driven institutional delay falls within the broad category of "more neutral reason[s]" that, under *Barker*, weigh only lightly against the State. *Barker*, 407 U.S. at 531. Additional delay was caused by Pullen's expert who needed time to obtain a software license to perform an independent forensic extraction of devices seized by the Texas Rangers. The State sought one continuance, granted October 31, 2023, on the ground that two material witnesses were unavailable: one located in Georgia was on a military assignment until December, and a second in New York was likewise unavailable. Pullen changed counsel in late 2023 and tabled his speedy-trial motion at that setting so new counsel could come "up to speed." The case was reset to January

---

[9] "Presumptive prejudice simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry." *Gabaldon*, 727 S.W.3d at 17 (citation modified).

29, 2024, then to July 23, 2024, then to August 26, 2024. Setting the pandemic-era delay aside, the bulk of the remaining delay was the product of routine resets, witness-availability issues, and Pullen's own continuance and change of counsel—not deliberate prosecutorial dilatoriness. *Cf. Zamorano*, 84 S.W.3d at 649 (delay caused by routine docket congestion and ordinary witness-availability issues weighs less heavily against the State than delay attributable to bad-faith or strategic prosecutorial conduct).

**Assertion of the right**. A defendant's lack of persistence in pressing his demand may weaken the assertion factor. *Cantu*, 253 S.W.3d at 282–83 (stating a defendant's assertion of, or failure to assert, their right to a speedy trial "is entitled to strong evidentiary weight in determining whether" the right is violated). Pullen filed his motion for speedy trial on September 8, 2022—roughly thirty-three months after his arrest—and filed a sworn motion to dismiss on January 31, 2024. He did not, however, press either motion at intermediate settings and agreed to table the issue at an October 2023 hearing to allow his newly-hired counsel to prepare.

**Prejudice**. Prejudice is assessed in light of three interests that the speedy-trial right protects: preventing oppressive pretrial incarceration, minimizing anxiety, and limiting impairment of the defense. *Barker*, 407 U.S. at 532. Pullen was released on bond and was not in pretrial custody. He identifies no specific witness who became unavailable, no evidence that was lost, and no specific impairment of his ability to mount his defense. His asserted prejudice is generalized anxiety and reputational harm flowing from the pendency of the charges. Although excessive delay can give rise to a presumption of prejudice that the State must rebut, *Doggett*, 505 U.S. at 655–58, that presumption is at its weakest where, as here, the defendant remains on bond and identifies no concrete impairment to his defense.

Weighing the *Barker* factors, we cannot say the trial court abused its discretion in denying Pullen's speedy-trial motion. Although the length of delay was substantial, the reasons for delay were largely neutral and in some instances attributable to the defense. Pullen was not persistent in pressing his demand and the only prejudice shown is generalized anxiety. We overrule Pullen's third issue.

## 4    Confrontation Clause

Pullen contends that the admission of Special Agent Krista Garcia's testimony by videoconference violated the Confrontation Clause. U.S. CONST. amend. VI. The State responds that Agent Garcia's appearance by videoconference was justified by public policy and necessity findings supported by a *Touhy* letter limiting Agent Garcia's ability to testify. *See* 5 U.S.C. § 301; *Touhy*, 340 U.S. at 467–68.

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The right to confront witnesses face to face lies at "the core of the values furthered by the Confrontation Clause." *Coy v. Iowa*, 487 U.S. 1012, 1017 (1988) (citation modified). But the right is not absolute and may give way to other important public-policy interests. *Id*. at 1020–21. Face-to-face confrontation may be dispensed with only if the trial court hears evidence and makes a case-specific necessity finding. *Maryland v. Craig*, 497 U.S. 836, 855 (1990).

The importance of a public-policy interest used to justify a necessity finding is a question of law we review de novo. *McCumber v. State*, 690 S.W.3d 686, 691–92 (Tex. Crim. App. 2024) (noting that *Maryland v. Craig* also requires that "the reliability of the testimony is otherwise assured"). The need for remote testimony to further that public-policy interest is a mixed question that requires an application of law to fact. *Id*. at 691. We afford "almost total deference" to the trial

court's determinations of mixed questions supported by the record when the resolution of those questions turns on an evaluation of credibility or demeanor. *Id*. (quoting *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We view the record and indulge all reasonable inferences in the light most favorable to the trial court's ruling. *McCumber*, 690 S.W.3d at 691–92 (citing *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996)). We must uphold the ruling if it is reasonably supported by the record and under any theory of law applicable to the case. *Id*.

Here, the State filed a "Request for Testimony via Zoom" and argued, based on *Touhy* that remote testimony was necessary because the federal government refused to allow Agent Garcia to testify in person and would only allow remote testimony. No *Touhy* letter, affidavit, or any evidence was attached to the motion. At a pretrial hearing on this motion, the State tendered copies of a *Touhy* letter to the court and to defense counsel. The defense argued that, based on *McCumber*, an evidentiary hearing was required and that no necessity was shown here. The State responded that the *Touhy* letter itself established the need for remote testimony because it was the only way Agent Garcia could testify. The trial court took the State's request under advisement.

Shortly before jury selection, the trial court made the following finding:

> **THE COURT**: All right. Just for purposes of the -- purpose of witnesses and putting on the record with respect to the testimony of Special Agent Krista Garcia of Homeland Security Investigations, the Court finds that there is a public policy interest in that the Homeland -- individuals who are federal agents cannot be compelled to testify via subpoena. Further, Special Agent Garcia does not reside in the State of Texas and isn't subject to any type of subpoena power, so, therefore, based on the Touhy letter, there is a necessity that she testify -- if she testifies, she may testify via Zoom. Okay?

Under *Maryland v. Craig*, the trial court must (1) hear evidence and (2) make a case-specific necessity finding. 497 U.S. at 855. While the trial court made a necessity finding, the only support is the *Touhy* letter itself, which is not in the record. Defense counsel objected to the State prosecutor attempting to testify as to the contents of the *Touhy* letter; however, no ruling was

obtained. While this is far from ideal practice, we need not decide whether these deficiencies resulted in error, because we conclude that any such error was harmless beyond a reasonable doubt. *See* TEX. R. APP. P. 44.2(a).

A denial of physical, face-to-face confrontation is reviewed for harmless error. *Haggard v. State*, 612 S.W.3d 318, 328 (Tex. Crim. App. 2020). Constitutional error is harmful unless a reviewing court determines beyond a reasonable doubt that the error did not contribute to the conviction. TEX. R. APP. P. 44.2(a). The harm analysis "cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation" because "such an inquiry would obviously involve pure speculation." *Haggard*, 612 S.W.3d at 328 (citing *Coy*, 487 U.S. at 1021–21). Instead, harm must be determined based on "the remaining evidence." *Id*. We thus consider the importance of the witness's testimony, whether it was cumulative, the presence or absence of corroborating or contradictory evidence on material points, and the overall strength of the State's case. *Id*. at 329–30.

Agent Garcia testified to four substantive matters: (i) she opened the DeepThroat splash page on July 8, 2019, and observed seven thumbnail images consistent with CSAM arranged below an advertisement for two membership tiers; (ii) an HSI task-force blockchain analysis traced a 0.008 BTC payment from a wallet associated with Pullen's IP address to the bitcoin address displayed on the splash page; (iii) subpoenas to BitPay and Coinbase resulted in responses that identified the wallet and ProtonMail account as Pullen's; and (iv) the splash page's images and the wallet address did not change during her investigation.

Each of these points was independently established by other witnesses. Officer Croft similarly described the splash page. Agent Hardin and Analyst O'Donnell independently established the blockchain trace. Ranger Evans testified to the subpoena information and that the

- 22 -

site persistently contained CSAM both before and after Pullen's visit. Pullen himself admitted visiting the page and sending bitcoin. Because the same facts were independently established through untainted sources, any error was harmless. *See Clay v. State*, 240 S.W.3d 895, 905–06 (Tex. Crim. App. 2007) (confrontation error harmless where the same evidence was admitted from other sources). We overrule Pullen's fourth issue.

## 5    Admission of magnified images

Pullen contends the trial court abused its discretion by admitting State's Exhibit 3, a magnified version of the seven thumbnail images that appeared on the DeepThroat website. He objected under Rule 403, arguing that the exhibit "misrepresent[ed] the clarity, the size, and . . . the representation" of what could have been seen on the page on the date of the offense.

We review the admission of evidence over a Rule 403 objection for clear abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). Rule 403 favors admission and requires exclusion of relevant evidence only if its probative value is "substantially outweighed" by, among other things, a danger of unfair prejudice or misleading the jury. TEX. R. EVID. 403. The Court of Criminal Appeals has articulated a six-factor balancing test for Rule 403 challenges. A trial court must balance (1) the inherent probative force of the proffered evidence and (2) the proponent's need for it against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency to confuse or distract the jury from the main issues, (5) any tendency to be given undue weight by a jury not equipped to evaluate it, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

**Probative force and the State's need**. The magnified images were highly probative. The State's burden under section 43.26 included proof that the images "visually depict[ed] a child

younger than 18 years of age . . . engaging in sexual conduct." Tᴇx. Pᴇɴᴀʟ Cᴏᴅᴇ Aɴɴ. § 43.26(a)(1) (West 2019). That inquiry necessarily turns on close visual examination of the depictions themselves. The magnification gave the jury a meaningful basis on which to evaluate whether each thumbnail depicted a child under eighteen engaged in sexual conduct—a determination informed by factors such as the focal point of the image, the setting, the child's pose and attire, and whether the depiction suggests sexual activity or is designed to elicit a sexual response. *Cf. Bolles*, 541 S.W.3d at 141–42 (applying the six-factor *Dost* analysis to an image to determine whether it depicted a child engaging in sexual conduct). These factors weigh in favor of admission.

**Risks of unfair prejudice, confusion, and misleading the jury**. An unmagnified screenshot of the webpage with full context was also admitted as evidence. The jury could thus compare the two exhibits and assess for itself whether Pullen could have recognized the thumbnails as containing child sexual abuse imagery. We reject Pullen's argument that Exhibit 3 distorted "the clarity, the size, and . . . the representation" of what would have been visible when he visited the website on July 2. These factors also weigh in favor of admission.

On this record, we cannot conclude the trial court abused its discretion by overruling Pullen's Rule 403 objection. We overrule Pullen's fifth issue.

## 6 Improper closing argument

Pullen contends the trial court erred in overruling his objection to a portion of the State's closing argument in which the prosecutor stated that Ranger Evans testified CSAM was on the website prior to Pullen's access.

Proper jury argument falls within four general categories: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to opposing counsel's argument, and (4)

plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008); *Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011). We review the trial court's ruling on Pullen's objection to the State's closing argument for an abuse of discretion. *Davis v. State*, 329 S.W.3d 798, 825 (Tex. Crim. App. 2010).

The prosecutor's statement was a permissible summation of, and reasonable deduction from, Ranger Evans's testimony. Ranger Evans testified that the site's bitcoin address "was being advertised on that dark web page with child porn images on the face of the page advertising for the membership and viewing of child porn to that address." He further testified that he "kn[e]w what was on the site before this transaction occurred and what was on the site after this transaction occurred." Whether that testimony rested on unobjected-to hearsay or lack of personal knowledge does not take the prosecutor's statements outside the bounds of ordinary summation. *Brown*, 270 S.W.3d at 570. The trial court did not abuse its discretion in overruling the objection to the State's closing. We overrule Pullen's sixth issue.

### 7    Judgment reformation

Finally, Pullen requests reformation of the nunc pro tunc judgment which incorrectly reflects that the trial court assessed punishment. The State does not contest Pullen's request and the record confirms the jury—not the trial court—assessed Pullen's punishment. We sustain Pullen's seventh issue. TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd). The judgment is modified to reflect that the jury assessed punishment.

## CONCLUSION

We vacate the convictions on counts two through seven. We modify the judgment of conviction on count one to reflect that the jury assessed punishment. As modified, the judgment is affirmed.

Velia J. Meza, Justice

PUBLISH